2025 IL App (2d) 240287-U
No. 2-24-0287
Order filed July 21, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-210 |
| QUINTON J. McKEE, | ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court.
Presiding Justice Kennedy and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court's denial of defendant's self-defense instruction was, at most, harmless error; (2) defendant was not denied effective assistance of counsel; (3) the evidence was sufficient to prove defendant's guilt beyond a reasonable doubt; and (4) the trial court did not abuse its discretion in sentencing defendant.

¶ 2    Following a jury trial, defendant, Quinton McKee, was convicted of five felonies and sentenced to 30 years' imprisonment for attempted first-degree murder, 10 years' imprisonment for aggravated discharge of a firearm, 8 years' imprisonment for unauthorized possession of a firearm by a felon, and 5 years' imprisonment for aggravated unlawful use of a weapon, all to be served concurrently.  On appeal, defendant claims (1) the trial court abused its discretion in

denying his requested jury instruction on self-defense, (2) his counsel was ineffective for failing to request additional jury instructions, (3) the State failed to prove the charge of aggravated discharge of a firearm beyond a reasonable doubt, and (4) the trial court abused its discretion in denying defendant's request to be sentenced as a Class 1 felony instead of a Class X felony for attempt (first degree murder). For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4       On June 1, 2022, the State charged defendant by information with two counts of attempted first-degree murder (720 ILCS 5/8-4(a), 9-1(a) (West 2022)), two counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2022)), one count of unlawful possession of a firearm by a felon (720 ILCS 5/24-1.1(a) (West 2022)), and one count of aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1), 24-1.6(a)(3)(A-5), 24-1.6(a)(3)(C) (West 2022)). On July 1, 2022, a grand jury indicted defendant on 11 charges, including the violations charged above and separating additional charges relating to his unlawful use of a firearm as a felon, without a current FOID card, and without a valid license under the Firearm Concealed Carry Act (430 ILCS 66/1 *et seq.* (West 2022)). The charges arose from an incident on May 31, 2022, in which defendant allegedly fired a handgun at his ex-girlfriend, Dazhia Mapp, and her father, Denarviz Mapp.

¶ 5                               A. Trial Testimony

¶ 6       At trial, Dazhia Mapp testified that she dated defendant for a few months in late 2021. In October of that year, defendant allegedly struck Dazhia across her face multiple times and threatened her with a handgun that had a unique American-flag print on it. Dazhia recorded two videos during the incident. One showed defendant's face. The second, longer video included a statement from defendant admitting he had struck Dazhia.

¶ 7     Dazhia testified she was no longer in a romantic relationship with defendant at the time of the May 31, 2022, incident.  She had stopped to fuel her Chevy Cruze at a gas station in Montgomery when defendant pulled behind her in a blue Jeep Cherokee.  Dazhia testified that defendant began yelling at her about money he claimed she owed him.  When she attempted to leave the gas station, defendant allegedly showed the gun with the American-flag print and threatened to kill her.  Dazhia testified that defendant threatened to "turn my car into Swiss cheese" and moved his Jeep to block her from leaving the gas station.  Surveillance video from the gas station showed the Jeep moving forward in the way of the Chevy Cruze, but any alleged gun inside the Jeep was not visible because of the camera angle.

¶ 8     Dazhia testified she left the gas station and drove East on Route 30.  Defendant followed her.  Dazhia increased her speed and defendant matched it.  Dazhia testified that she tried to outrun defendant, increased her speed to 109 MPH, drove through gravel, and ran a redlight.  She lost sight of his vehicle briefly, but defendant caught up with Dazhia as she made a U-turn on Route 30.  Dazhia had turned to drive to the Montgomery police department as defendant pulled up parallel to her vehicle.  She testified defendant's passenger window was rolled down and she could hear him yelling at her.

¶ 9     Dazhia testified she heard a single gunshot as their cars were parallel.  She was facing forward and not looking at defendant.  She testified that after she heard the gunshot, she turned to look at defendant and saw him shake his head, say "yeah" and demand that she pull over.  Dazhia testified that she did not see the gun in defendant's hand after she heard the gunshot.

¶ 10   Dazhia called her father and told him that she believed defendant had shot at her.  Defendant pulled behind her as she turned from Orchard Road to Mayfield Drive.  It was at this intersection that she saw her father, Denarviz Mapp, in his pickup truck.  Dazhia testified that

Denarviz drove between her vehicle and defendant's vehicle. Dazhia drove to her home, called 911, and testified she discovered a new, triangular-shaped dent above the driver's side window of her car.

¶ 11　Dazhia testified that she had purchased the 2013 Chevy Cruze as a used vehicle in July 2021. She stated that the car was in good repair when she bought it and did not have any dents or marks in the bodywork. A mechanical issue arose that prevented her from lowering the driver's side window on the day of the incident, but the vehicle did not have the triangular-shaped dent before that day.

¶ 12　On cross-examination, Dazhia agreed she had not seen defendant with a gun when she heard the shot. She described the sound of the gunshot as a "pop" and stated she heard the projectile hit her vehicle. When asked about her written statement to the police, Dazhia explained that she was "trying to give the basic details" of the incident and did not include seeing defendant with a gun or his threat to turn her car into "Swiss cheese."

¶ 13　Denarviz Mapp testified he was Dazhia's father, and she lived with him in Montgomery. Shortly before noon on May 31, 2022, he asked Dazhia to drive to pick up food for his lunch before he left for work. Denarviz testified his daughter called him 10-15 minutes later and informed him that defendant was chasing her in a blue SUV and had allegedly shot at her. Denarviz left home in his Dodge Ram pickup truck and saw his daughter's car after pulling onto Mayfield Drive. Denarviz testified he cut in front of defendant's Jeep and defendant turned onto a back road behind Walgreens. Mr. Mapp followed defendant onto the back road to verify that defendant was no longer following his daughter.

¶ 14　Denarviz testified he pulled behind defendant's vehicle as defendant waited to turn back onto Orchard Road. When defendant suddenly ducked down after seeing the pickup behind him,

Denarviz testified he was afraid defendant was reaching for the gun he had used to fire at his daughter's car. Denarviz testified that he "didn't know if he was grabbing a gun, so I immediately jammed on the gas to push him out into the road so I can get away because I didn't know if he was going to shoot me next." He continued pushing the Jeep with his pickup until Defendant's vehicle was across the lane and onto the median.

¶ 15    Once the Jeep was out of the turning lane, Denarviz testified he turned onto Orchard Road to get away from defendant and return home. He testified he saw a gun in defendant's hand as he passed the Jeep and heard three gunshots. When he returned home, Denarviz found a bullet hole in the driver's side door and a second bullet hole near the center of the truck. A bullet was found in the front seat interior. He also testified there was minimal damage to his front bumper, notably a slightly bent license plate.

¶ 16    Denarviz testified he had a FOID card and kept a handgun in a locked box in his closet. He did not take the gun with him when he responded to his daughter's call. Denarviz kept a black, rolling backpack in his truck for work. The bag was in the truck when the police searched the vehicle after the incident, Denarviz testified.

¶ 17    Kara Fontana testified she was near Orchard Road during the incident. She heard a loud noise and saw a pickup truck aggressively pushing an SUV onto the road. A part of the SUV fell off onto the roadway. Once the pushing stopped, she heard three gunshots. Fontana testified she later walked past Walgreens and saw that one of its windows had a bullet hole. She did not know defendant or the Mapps.

¶ 18    Gregory Mayyou of the Montgomery Police Department testified that he heard a radio call of shots fired near Orchard and Mayfield. During his investigation, he found a reflector casing from a vehicle on Orchard Road. He found a spent cartridge casing on the road and recovered a

spent bullet from inside the Walgreens. Mayyou examined Dazhia's vehicle and noted a dent above the driver's door which he described as a hole, ricochet, or deflection. On cross-examination, he testified he did not recall hearing radio reports of shots fired elsewhere during the incident. He had looked inside Denarviz' truck but did not recall seeing a black backpack.

¶ 19   The State next called Jason Friedrich, a detective for the Montgomery Police Department. Friedrich testified that he had reported to Orchard and Mayfield after hearing the radio call for shots fired in that area. He spoke to both Dazhia and Denarviz. Based upon this information, Friedrich put out a "be on the lookout" alert for defendant. Friedrich testified he was notified by the Bolingbrook Police Department that an officer had identified defendant that evening but was unable to apprehend him. Defendant was arrested on June 6, 2022.

¶ 20   The parties stipulated that Nicholas Higens, an officer with the Bolingbrook Police Department, would testify that he found defendant in a blue Jeep Cherokee in the evening of May 31, 2022. Higens identified himself as a police officer and asked him about the incident in Montgomery. Defendant refused to get out of the vehicle and drove away. The parties also stipulated that Zachary Schmitt of the U.S. Marshals Service would testify that defendant was driving a white Chevrolet Malibu when he arrested him on June 6, 2022. The parties further stipulated that defendant did not possess a FOID card or a concealed carry license.

¶ 21   The State called Bradley Jasutis of the Montgomery Police Department. Jasutis testified he processed the white Malibu and found an empty 9mm magazine, a wallet containing defendant's driver's license and social security card, and the defendant's vehicle registration in the glove compartment. Jasutis also testified he recovered two cellphones from the vehicle, an Android phone and an iPhone.

¶ 22   Steve Bruening, a sergeant with the Kane County Sheriff's Office with training in the extraction of data from cellphones testified he had received the Android phone and iPhone and was asked to extract data from both.  He testified he used the tools at his disposal to extract data from the Android phone, a TCL model, but was unsuccessful.  He was initially unsuccessful with the iPhone, but a software update to the Graykey product allowed him to successfully extract data from the device.  He used a product from Cellebrite to analyze the data and generate a UFED report.  Bruening explained that the UFED format allows reading of the data but is a format that cannot be altered by the user.  On cross-examination, Bruening admitted that the Cellebrite tool allows users to see photos stored on a phone, but the meta data associated with the photo would not be sufficient, by itself, to confirm that the photo was taken by that specific cellphone.

¶ 23   Anthony Hull next testified.  Hull, a detective in the investigative division of the Montgomery Police Department, testified he had trained as an evidence technician.  In the immediate matter, Hull received the two cellphones from defendant's vehicle and passed them on to Bruening at the Kane County Sheriff's Office for the extraction of the contents of the cellphones.

¶ 24   Hull testified he reviewed the extraction report from Bruening.  The report contained a photo of a handgun with an American flag print and a photo of a blue Jeep Cherokee with a missing rear reflector, among other things.  Hull also testified to several text message conversations between defendant and other individuals, as well as a variety of searches defendant performed after the incident.  The messages include references to defendant being aware the police were looking for him, his desire to have a vehicle detailed to remove gun powder residue, his switching vehicles, and defendant discussing possibly leaving Illinois.  On cross-examination, Hull agreed he found no messages in which defendant stated he fired a gun at Dazhia and was not aware of defendant actually leaving the state.  The State rested.

¶ 25    Defendant testified on his own behalf. He stated that Dazhia had reached out to him on May 31, 2022, to pay him back money she owed to him. They met at the gas station and defendant agreed to follow her to the Fifth Third Bank on Route 30. Defendant explained that he borrowed the Jeep from a friend and was aware that there was a gun in the glove compartment, but it did not belong to him. He claimed he did not take the gun out of the glove compartment during his conversation with Dazhia at the gas station.

¶ 26    Defendant testified he followed Dazhia on Route 30 until she made a U-turn near Douglas Road. As their vehicles were parallel, defendant asked why Dazhia had turned around and she allegedly told him that they should go to the Chase Bank on Orchard and Mayfield. He testified that he did not take the gun out of the glove compartment. As they approached the bank, defendant stated that Denarviz' pickup truck cut him off and that he "almost had to really go on the sidewalk to stop me being hit." Defendant testified that Dazhia drove past the Chase Bank branch, realized "something was going on," and made a right turn onto a road behind Walgreens.

¶ 27    Defendant testified that Denarviz began to repeatedly ram his truck into the back of the SUV defendant was driving. He rammed defendant's vehicle as he turned onto the access road. Defendant had to stop before turning back onto Orchard, but Denarviz pushed defendant's vehicle into the intersection.

¶ 28    Defendant testified that, when Denarviz pulled alongside defendant's vehicle, Denarviz pulled an assault rifle from a black bag on his lap. Denarviz aimed the assault rifle at defendant and it was only then that defendant realized the other driver was Dazhia's father. Defendant testified he was afraid for his safety; he pulled the gun from the glove compartment and fired three times. Defendant explained that he was aiming for the lower portion of the truck. He fired the gun to scare Denarviz and did not intend to kill him.

¶ 29    When asked about the first time he met Denarviz, defendant testified that he had gone to pick up his cell phone from Dazhia's house. After a brief conversation, Denarviz allegedly brought out an assault rifle and told defendant "If I see you again, I'm going to kill you."

¶ 30    On cross-examination, defendant stated that the gun in the Jeep was a black Glock 19 and did not have an American flag print. He denied shooting at or threatening to kill Dazhia. He stated that he did not call the police when Denarviz rammed his vehicle because he doesn't "cooperate with police." He agreed Denarviz never fired a gun at him, but said "you aim a gun at me, and I have the opportunity to defend myself, I feel like my life is in danger, that's what I will do." Defendant admitted that one of his gunshots hit the Walgreens window but suggested that the kickback from the first two shots must have caused the bullet to go higher than Denarviz's truck. Defendant also admitted wanting to remove gunshot residue from a vehicle but claimed he "wasn't hiding anything." He further admitted to searching for when it was legal to shoot someone and how to "beat" an attempted murder charge, and that he did not mention Denarviz's alleged assault rifle in the many text conversations or chat he had with friends about the incident.

¶ 31    The State recalled Denarviz in rebuttal. He testified that he did not own an assault rifle and did not have any firearm with him during the incident. He had a valid FOID card and owned a 9mm handgun. Denarviz testified that the handgun was stored in a secured lockbox at home and he did not have it with him during the incident. The black bag in his truck was a large, rolling backpack that he used to carry materials for work and would not be small enough to hold in his lap while he was driving.

¶ 32    The State next presented certified copies of defendant's previous criminal convictions to be published to the jury. These included criminal damage to property (Class 4 felony) in case no. 16 CF 1127, unlawful delivery of cannabis (Class 4 felony) in case no. 18 CF 55, and unlawful

possession of a weapon by a felon (Class 3 felony) and unlawful possession of controlled substance (Class 4 felony) in case no. 20 CF 352.

¶ 33                    B. Jury Instruction Conference

¶ 34    Defendant's trial counsel submitted jury instruction on self-defense as an affirmative defense. During the jury instruction conference, the trial court held there was insufficient evidence to warrant the instruction for self-defense. The court took no position on whether defendant was the initial aggressor but noted that the State was only required to negate one of the six elements. The trial court denied the jury instruction on self-defense.

¶ 35                    C. Deliberation and Verdict

¶ 36    The jury began deliberating in the evening of October 19, 2023. During the early part of deliberations, the trial court received a question from the jury on "what the transcripts say when Dazhia heard the gunshot." After reaching a consensus with counsel, the trial court returned an answer that the jury had heard all of the evidence that is proper and pertinent in the case and had received instructions which cover the applicable law, and that the law requires them to render its verdict on the evidence and instructions already given.

¶ 37    At 9:20 pm, the jury asked if it was common procedure for an evidence technician to take photos of the entire inside of a vehicle that was driven by the victim of a gun-related crime. After discussing the question with counsel, both parties agreed to send the same answer to the second question.

¶ 38    The jury sent a third note to the trial court at 10:04 pm. In it, the jury stated it was "currently undecided on three of the seven charges against defendant. What are our options? Please advise." After discussing options with counsel, the trial court replied that the jury should continue deliberating in an effort to reach a verdict based on the evidence and testimony presented during

the trial, but there would be an option to break for the evening if they were unable to complete deliberation.

¶ 39    At 11:08 pm, the jury asked for a legal definition of intent to kill. Counsel for the State and defendant agreed to a reply from the trial court that the instructions already given cover the law applicable to the case. At 11:57 pm, the trial court asked counsel to return. There was not a question from the jury, but the trial court suggested that the jury be given the option to recess for the evening. The parties agreed and the jury was sent home until 8:30 am on October 20, 2023.

¶ 40    The jury deliberated most of October 20. At 2:54 pm, the trial court addressed the jury to ask the foreperson if they believed further deliberation would be fruitful with respect to the remaining charges. The foreperson stated that it might be useful for one charge, but that there was another charge which seemed unlikely to be resolved by further deliberation. The jury returned to deliberation and sent a question to the trial court at 3:43 pm. The question was "when can a person use force to defend themselves?" The trial court, with the agreement of the parties, sent an answer similar to the ones provided to the earlier questions.

¶ 41    The trial court called the jury back into the courtroom at 4:44 pm. The trial court noted the jury had sent a note a indicating they had made a decision on six of the charges but were in "solid disagreement" on one remaining charge. The trial court asked each juror individually if he or she believed they could reach a verdict on the remaining charge and all answered "no." The trial court asked the jury to provide the completed verdict forms and informed the parties that it would declare a mistrial on the unresolved charge.

¶ 42    The jury found defendant guilty of attempt first degree murder of Denarviz Mapp, aggravated discharge of a firearm at a vehicle driven by Denarviz Mapp, aggravated discharge of a firearm at a vehicle driven by Dazhia Mapp, unlawful possession of a weapon by a felon, and

aggravated unlawful use of a weapon for both possessing a weapon in a vehicle and on his person. The jury did not agree, and the court found a manifest necessity for a mistrial, on the charge of attempt first degree murder of Dazhia Mapp.

¶ 43                                D. Post-Trial Proceedings

¶ 44    The trial court conducted the sentencing hearing on March 22, 2024.  Defendant, through his trial counsel, filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.  The trial court held a hearing on the motion and denied it.  The State presented Raymond Ritter, an officer with the Montgomery Police Department, to testify to evidence in aggravation.  Ritter responded to the alleged violation of an order of protection by defendant against Dazhia.  He testified that records from the Kendall County Jail showed that defendant had called Dazhia on 68 occasions, including at least twice when he successfully made contact with her, since his arrest.  Denarviz read his victim impact statement.  Defendant presented no evidence in mitigation.

¶ 45    The State and defense counsel presented arguments in aggravation and mitigation, respectively.  The State requested the trial court sentence defendant to 36 years in prison out of a potential sentencing range of 26 to 50 years for attempt first degree murder.  Defense counsel asked for the minimum sentence for each charge, including 26 years for attempt first degree murder.  Defendant chose not to make a statement in allocution but stated his belief that he received ineffective assistance of counsel.

¶ 46    The trial court sentenced defendant to 30 years for attempt first degree murder of Denarviz and merged the conviction of discharge of a firearm at Denarviz into this sentence.  The court sentenced defendant to 10 years in prison for aggravated discharge of a firearm at Dazhia, 8 years for unlawful possession of a firearm by a felon, and 5 years for the aggravated unlawful use of a

weapon. All convictions were to be served concurrently with the sentence imposed in case no. 20 CF 352 and with each other. [1]

¶ 47 Defendant filed a *pro se* pleading alleging ineffective assistance of counsel. The trial court held a preliminary *Krankel* inquiry and found that defendant's claims failed to show possible neglect by his trial counsel. Defendant's trial counsel then filed a motion to reduce or reconsider his sentence, arguing he should be sentenced for a Class 1 felony and not a Class X felony for attempt (first degree murder). The trial court denied the motion. This timely appeal followed.

¶ 48                                     II. ANALYSIS

¶ 49 At issue in this appeal is: (1) whether the trial court abused its discretion in refusing to instruct the jury on self-defense, (2) whether defendant's trial counsel was ineffective, (3) whether the evidence was sufficient to prove defendant guilty beyond a reasonable doubt, and (4) whether the trial court abused its discretion in sentencing defendant. For reasons that follow, we affirm the trial court.

¶ 50                                   A. Self Defense

¶ 51 Defendant asserts that the trial court abused its discretion in denying the requested jury instruction on self-defense. Defendant had requested modified Illinois Pattern Jury Instructions, Criminal (hereinafter IPI Criminal) No. 6.07X and No. 18.12, as well as No. 24-25.06. IPI Criminal No. 24-25.06 states that a person "is justified in the use of force when and to the extent he reasonably believes such conduct is necessary to defend himself against the imminent use of unlawful force." And while the State inexplicably failed to address whether the denial of the

---

[1]In its brief, appellate defense counsel mistakenly describes the sentences to be served consecutively.

instruction was error, the State did assert that the trial court's refusal to instruct the jury on self-defense was harmless error.

¶ 52    Jury instructions should guide jury deliberations and help the jury reach the proper verdict through the application of legal principles to the evidence. *People v. Parker*, 223 Ill. 2d 494, 500 (2006). Jury instructions should be construed as a whole and not read in isolation. *People v. Ward*, 187 Ill. 2d 249, 265 (1999). "[W]hen the trial court, after reviewing all the evidence, determines that there is insufficient evidence to justify the giving of a jury instruction, the proper standard of review of that decision is abuse of discretion." *People v. McDonald*, 2016 IL 118882, ¶ 42.

¶ 53    Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving, beyond a reasonable doubt, not only all the elements of the charged offense but also that the defendant did not act in self-defense. *People v. Lee*, 213 Ill. 2d 218, 224-25 (2004). The elements of self-defense are: (1) unlawful force was threatened against the defendant, (2) the defendant was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the defendant subjectively believed a danger existed that required the use of the force applied, and (6) the defendant's belief was objectively reasonable. *Id*. at 225; see also 720 ILCS 5/7-1 (West 2022). If the State negates any element of self-defense, the defense fails. *Lee*, at 225; *People v. Martinez*, 2019 IL App (2d) 170793, ¶ 70. It is "well settled" that a defendant is entitled to a jury instruction on self-defense "if there is some evidence, however slight, in the record to support that defense." *People v. Washington*, 2012 IL 110283, ¶ 43. And as recently explained by our supreme court, a defendant "who subjectively believes in the need for self-defense cannot be convicted of attempted first degree murder because the defendant would not have the specific intent to commit first degree murder." *People v. Guy*, 2025 IL 129967, ¶ 47.

¶ 54    During the jury instruction conference, the trial court provided a detailed analysis of the six elements of self-defense as applied to defendant. The trial court found that four of the six elements had not been established. Specifically, the court found that the danger of harm was not imminent, that the use of force was not necessary, that the defendant did not actually and subjectively believe a danger existed that required the use of force, and that such a belief, if held, was unreasonable. Based on this analysis, the trial court rejected the proposed jury instruction on self-defense.

¶ 55    In the instant case, there was no evidence to support the request for an instruction on self-defense. Based upon the total transaction, defendant was clearly the aggressor. He threatened Dazhia at the gas station and delivered on his threats when he fired at her as she attempted to flee. He was still in pursuit of Dazhia when Denarviz intervened. Even if defendant briefly believed he was in danger of being harmed, that moment had passed and he fired three times at Denarviz as the latter was retreating. Further, defendant has failed to convince us that he reasonably believed he was in danger of being harmed. His car, perhaps, but not himself. Based on the record, we find the trial court's refusal of the jury instruction on self-defense to not be error.

¶ 56    Assuming *arguendo* that it was error, we determine that the trial court's refusal was harmless error. Jury instructions are, as the name suggests, instructional and not structural, and therefore not subject to automatic reversal. *Washington*, 2012 IL 110283, ¶ 59. An instructional error is harmless beyond a reasonable doubt if the result of the trial would not have been different had the jury been properly instructed. *Id*. ¶ 60; *People v. Russell*, 2022 IL App (2d) 190733, ¶ 39. In other words, "[w]here the evidence of guilt is clear and convincing, an instructional error may be deemed harmless." *People v. Dennis*, 181 Ill. 2d 87, 95 (1998).

¶ 57    The evidence of defendant's guilt was considerable, and almost all evidence of self-defense came from defendant's self-serving testimony.  Defendant claimed that Denarviz rammed his vehicle repeatedly, but the only physical evidence of contact was a slightly bent license plate and a broken reflector.  Defendant claimed he saw Denarviz withdraw an assault rifle from a black bag.  However, there is also evidence that the bag was a large, rolling bag, and defendant's vehicle was considerably lower than Denarviz' pickup truck.  It seems highly unlikely that defendant could have seen across the passenger side of his vehicle to see the lap of the driver in a large pickup truck beside him.  From that angle, it would have been difficult for defendant to observe either the bag or the alleged assault rifle on Denarviz's lap.  And defendant's claim that Denarviz was driving with a large bag on his lap while simultaneously holding an assault rifle defies common sense.  While there was evidence that defendant used his cellphone to search for ways to "beat" attempted murder charges and clean gunshot residue from his vehicle and person, there was no evidence that he communicated to any of his friends regarding Denarviz having an assault rifle during the incident.  He told a friend of his incredulity over being charged with attempted murder when he "ain't even pop nobody" and his plans to leave the state.  Defendant hid from the police and paid to have his vehicle detailed to remove gunpowder residue.  Based on the record, we find the trial court's refusal of a jury instruction on self-defense to be harmless error at best.

¶ 58                         B. Ineffective Assistance of Counsel

¶ 59    In the alternative, defendant argues that he was denied effective assistance of counsel when trial counsel failed to offer a jury instruction on the initial aggressor's use of force and intent.  Specifically, defendant asserts that his trial counsel should have offered IPI Criminal No. 24-25.09 and No. 5.01 A.  The State counters that defendant was not prejudiced by his trial counsel's performance and that the decision to not offer the jury instructions was sound trial strategy.

¶ 60    The right to counsel is, in effect, the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 (1970); *People v. Rogers*, 2021 IL 126163, ¶ 23. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To succeed in his claim, defendant must show two things: that the performance of his counsel was deficient and that he was prejudiced by such deficiency. *Id.* at 694. In *People v. Albanese*, our supreme court adopted *Strickland* and noted specifically that a court can dispose of a claim of ineffective assistance of counsel for a lack of sufficient prejudice without determining if such counsel was deficient. *People v. Albanese*, 104 Ill. 2d 504, 527 (1984). Even if a trial strategy did not result in an outcome favorable to the defendant, we "must make every effort to eliminate 'the distorting effects of hindsight.' " *People v. Peterson*, 2017 IL 120331, ¶ 88 (quoting *Strickland*, 466 U.S. at 689). "There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *People v. Miller*, 346 Ill. App. 3d 972, 982 (2004) (citing *People v. Smith*, 195 Ill. 2d 179, 188 (2000)).

¶ 61                          1. Initial Aggressor's Use of Force

¶ 62    Defendant's trial counsel requested a jury instruction for self-defense, specifically IPI Criminal No. 24-25.06. Defendant claims that his trial counsel was ineffective for not also offering IPI Criminal No. 24-25.09 for the initial aggressor's use of force:

> "A person who initially provokes the use of force against himself is justified in the
> use of force only if
>
> [1] the force used against him is so great that he reasonably believes he is in
> imminent danger of death or great bodily harm, and he has exhausted every reasonable

means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person.

[or]

[2] in good faith, he withdraws from physical contact with the other person and indicates clearly to the other person that he desires to withdraw and terminate the use of force, but the other person continues or resumes the use of force."

¶ 63    As noted above, defendant testified that he had been merely following Dazhia and had not fired a shot at her. Defendant was calmly driving behind Dazhia when Denarviz cut him off and began to aggressively ram his vehicle. Denarviz pushed defendant's vehicle into traffic and then aimed an assault rifle at him. It was only then that defendant reacted and fired three shots at Denarviz to scare him away.

¶ 64    In other words, defendant testified he was *not* the initial aggressor against either Dazhia or Denarviz. He had not threatened Dazhia. He had not chased her or shot at her. For defendant to have been the initial aggressor, he would have had to concede that he had initially provoked the use of force against himself. He could have accomplished this by admitting that he was the aggressor against Dazhia, but that would have been directly counter to his testimony. As noted by the State, the instruction could have also highlighted the fact that there was no evidence presented that defendant tried to withdraw from the conflict.

¶ 65    Defendant's trial counsel could have declined to offer the jury instruction on the initial aggressor's use of force as a trial strategy. Defendant may have wished that this instruction could have undercut Denarviz's testimony, but it could have easily backfired. This instruction could have strengthened the State's position. And when viewed with the evidence against defendant, we

find that defendant has failed to satisfy either prong of *Strickland* as it relates to the instruction for the initial aggressor's use of force. See *Albanese*, 104 Ill. 2d 504, 527.

¶ 66                                    2. Intent

¶ 67    Defendant also alleges that his trial counsel was ineffective for failing to offer a jury instruction on the definition of intent when the jury had asked the trial court for a "legal definition of 'intent to kill' " during jury deliberations. Defendant claims that his trial counsel should have offered IPI Criminal No. 5.01 A. However, the State correctly notes that the committee comment took no position on how often the instruction should be given since "intentionally" was given a plain meaning that should already be understood by the jury.

¶ 68    Defendant has failed to meet the second prong of *Strickland*. The jury was unable to reach a verdict on the attempted murder charge against Dazhia. Defendant speculates that the jury instruction on "intent" could have resulted in him being found not guilty of attempted murder against Denarviz, but it is just as possible that he could have been found guilty of attempted murder against *both* Dazhia *and* Denarviz. Defendant asserts that the jury instruction providing the common definition of intent is somehow significantly different than the common-sense definition the jury applied, but this argument is specious, at best. The defendant has failed to show prejudice.

¶ 69                                 3. Cumulative Error

¶ 70    Moreover, we are not persuaded by defendant's argument that the errors cumulatively denied him a fair trial. The cumulative error doctrine states that "individual trial errors that do not entitle a defendant to appellate relief may do so if the errors, when considered in the aggregate, 'have the cumulative effect of denying [the] defendant a fair trial.' " *People v. Quezada*, 2024 IL 128805, ¶ 46 (quoting *People v. Speight*, 153 Ill. 2d 365, 376 (1992)). Cumulative errors can only arise from actual trial errors. *People v. Franklin*, 135 Ill. 2d 78, 105 (1990).

¶ 71    As discussed above, the trial court declining to instruct the jury on self-defense was, at best, harmless error.  Even if we were to accept that defendant's trial counsel committed an error in not tendering an instruction on the definition of intent, we have held that the error did not prejudice defendant.  These two alleged errors would not have combined to create a cumulative error that denied defendant a fair trial.  We therefore hold that there was no cumulative error.

¶ 72                              C. Sufficiency of Evidence

¶ 73    Defendant asserts that the evidence was insufficient to prove him guilty of aggravated discharge of a firearm at Dazhia Mapp beyond a reasonable doubt.  In making this claim, defendant notes that Dazhia testified she did not see defendant with a gun after she left the gas station and only heard a "pop" sound when something hit her vehicle.  The State counters that there was evidence that defendant threatened Dazhia, chased her at high speeds, and tried to make good on his threat to turn her car into "Swiss cheese" by firing at her vehicle during the chase.

¶ 74    The due process clause of the fourteenth amendment to the United States Constitution requires that a person can only be convicted in a state court upon proof beyond a reasonable doubt of every essential element of the crime with which they were charged.  *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007).  "When a defendant challenges the sufficiency of the evidence, it is not the function of this court to retry the defendant." *People v. Evans*, 209 Ill. 2d 194, 209 (2004).  Rather, the appropriate question is whether, after viewing the evidence in the light most favorable to the State, *any* trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *People v. Gray*, 2017 IL 120958, ¶ 35; *People v. Ostrowski*, 394 Ill. App. 3d 82, 91 (2009).  This standard of review applies whether the evidence is direct or circumstantial, and "circumstantial evidence that meets this standard is sufficient to sustain a criminal conviction." *People v. Jackson*, 2020 IL 124114, ¶ 64.

¶ 75    The United States Supreme Court has stated that "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979).  "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985).  The trier of fact is in the best position to judge the credibility of witnesses.  *People v. Smith*, 185 Ill. 2d 532, 541-42 (1999).  Due deference must be given to the fact that the trial court and jury saw and heard the witnesses.  *Wheeler*, 226 Ill. 2d at 114.  "Accordingly, a jury's findings concerning credibility are entitled to great weight." *Id.*  Deference is not conclusory, however, and a conviction "will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Lamonica*, 2021 IL App (2d) 200136, ¶ 36.

¶ 76    The evidence presented at trial was sufficient for a jury to find defendant guilty beyond a reasonable doubt.  The jury heard testimony that defendant pointed a gun at Dazhia at the gas station and threatened to turn her vehicle into "Swiss cheese."  A recent photo of a handgun with an American flag design, similar to the one described by Dazhia, was found on defendant's cellphone.  The jury heard testimony that defendant chased Dazhia at a high rate of speed and had pulled next to her when she heard the sound of gun fire and something striking her vehicle.  Both Dazhia and Detective Mayyou described the new dent in the vehicle as a ricochet, and the jury was shown photographs of the damage.  Dazhia called her father to let him know that defendant had shot at her.  Moments later, defendant fired three times at Denarviz' vehicle.

¶ 77     Defendant notes that officers did not attempt to recover physical evidence near Route 30 and Douglas, the location of the first shooting.  While it might have been helpful for officers to recover physical evidence from both shooting locations, physical evidence is not necessary to corroborate eyewitness accounts of a shooting.  See *People v. Corral*, 2019 IL App (1st) 171501, ¶ 91.  Considering the record in the light most favorable to the State, we are unable to conclude that the jury's finding is so improbable that it creates reasonable doubt as to defendant's guilt.

¶ 78                                             D. Sentencing

¶ 79     Finally, defendant argues that the trial court abused its discretion in sentencing by applying Class X sentencing to his conviction for attempt (first degree murder) instead of Class 1 sentencing. The State counters that defendant forfeited this claim, invited the error, and failed to prove by a preponderance of the evidence that he acted with sudden and intense passion resulting in strong provocation.

¶ 80     The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.  A trial court has broad discretion in imposing a sentence. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995).  A sentence that falls within the statutory range should only be reversed when the court has abused that discretion.  *People v. Patterson*, 217 Ill. 2d 407, 448 (2005).  "The trial court must base its sentencing determination on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Fern*, 189 Ill. 2d 48, 53 (1999).  A trial court abuses its discretion when the penalty imposed is "greatly at variance with the spirit and purpose of the law, or is manifestly disproportionate to the crime." *People v. Watt*, 2013 IL App (2d) 120183, ¶ 49.  A trial court is given wide latitude in sentencing

as long as it neither ignores relevant mitigating factors nor considers improper aggravating factors. *People v. McGee*, 2020 IL App (2d) 180998, ¶ 8. It is the responsibility of the trial court to balance the relevant factors to make a reasonable decision, and it is not for a reviewing court to reweigh such factors. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). Generally, a sentence falling within the statutory range will be presumed to be proper. *People v. Campos*, 2024 IL App (2d) 230056, ¶ 53.

¶ 81 Here, defendant was convicted of a Class X felony offense. As a result, he was subject to a sentencing range of 6 to 30 years in prison for the attempt first degree murder of Denarviz Mapp. See 720 ILCS 5/8-4(c)(1) (West 2022); 730 ILCS 5/5-4.5-25(a) (West 2022). Defendant was also subject to a 20-year mandatory sentencing enhancement, as he personally discharged a firearm during the offense. See 720 ILCS 5/8-4(a) (West 2022). As a result, defendant was eligible for a sentencing ranging from 26 to 50 years for the offense.

¶ 82 On appeal, defendant argues that the trial court abused its discretion by not applying a section of the attempt murder statute that would reduce the sentencing to a Class 1 felony:

"[I]f the defendant proves by a preponderance of the evidence at sentencing that, at the time of the attempted murder, he or she was acting under a sudden and intense passion resulting from serious provocation by the individual whom the defendant endeavored to kill, or another, and, had the individual the defendant endeavored to kill died, the defendant would have negligently or accidentally caused that death, then the sentence for the attempted murder is the sentence for a Class 1 felony." 720 ILST 5/8-4(c)(1)(E) (West 2022).

¶ 83 The State counters that defendant forfeited the alleged sentencing error by failing to ask the trial court to apply this sentencing statute. To preserve this issue for appeal, defendant was

required to both make a contemporaneous objection at the sentencing hearing and to raise the issue in a post-sentencing motion. *People v. Bannister*, 232 Ill. 2d 52, 76 (2008). While defendant did raise this issue in his post-sentencing motion, he failed to make an objection during the sentencing hearing. Defendant mentioned the statute in passing, but did not present any argument as to how it might apply to the sentence. Accordingly, this contention was procedurally forfeited. However, "forfeiture is 'an admonition to the parties, not a limitation upon the jurisdiction of the reviewing court' " (*People v. Quezada*, 2024 IL 128805, ¶ 48 (quoting *Hux v. Raben*, 38 Ill. 2d 223, 224 (1967))), we may review the issue.

¶ 84     The State further asserts that defendant invited the alleged error by requesting the minimum Class X sentence of 26 years of imprisonment and not a sentence within Class 1 sentencing range. The doctrine of invited error or acquiescence is a form of procedural default or estoppel. *People v. Liekis*, 2012 IL App (2d) 100774, ¶ 24. It is "well established that 'an accused may not ask the trial court to proceed in a certain manner and then contend in a court of review that the order which he obtained was in error.' " *People v. Segoviano*, 189 Ill.2d 228, 241 (2000) (quoting *People v. McDonald*, 153 Ill. 2d 195, 199 (1992)); see also *People v. Abston*, 263 Ill. App. 3d 665, 671 (1994) ("where the trial court's course of action is taken at defendant's suggestion and the defendant thereafter acquiesces in the court's expressed course of conduct, the defendant should be precluded from raising such course of conduct as error on appeal"). The rationale for the doctrine is that it would be unfair to grant a party relief based on errors that they introduced into the proceedings. *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110013, ¶ 33. And where a defendant has invited or acquiesced to the error, we decline to review any related plain-error claim. *People v. Hernandez-Chirinos*, 2024 IL App (2d) 230125, ¶ 76.

¶ 85    Defendant's trial counsel made the strategic decision to argue for the minimum sentence of 26 years under Class X rather than try to prove that defendant was acting under a sudden and intense passion. Defendant cannot now claim that the trial court abused its discretion in sentencing him under the very sentencing range suggested by his trial counsel. Defendant has not claimed that his counsel was ineffective for requesting the minimum Class X sentence rather than arguing for a Class 1 sentence. Even if we had not already determined this issue forfeited, the alleged error was invited.

¶ 86    Furthermore, we would find that the trial court did not abuse its discretion in sentencing defendant if we were to address the issue on its merits. Defendant did not prove by a preponderance of the evidence that he acted under a sudden and intense passion. Our supreme court has held that there are four categories of serious provocation: "(1) substantial physical injury or assault, (2) mutual quarrel or combat, (3) illegal arrest, and (4) adultery with the offender's spouse." *People v. Haynes*, 2024 IL 129795, ¶ 36. Only mutual quarrel or combat could apply to the facts in the immediate matter. However, a slight provocation is not sufficient because the retaliation must be proportionate to the provocation. *Id*. at ¶ 46. Here, defendant's vehicle was pushed with so little force that a broken reflector was the only resulting damage. His firing a handgun three times at Denarviz was grossly disproportionate. The trial court did not err in sentencing defendant under Class X guidelines.

¶ 87    We note that the State requested a 36-year term of imprisonment, and the defense requested a 26-year term. The trial court fully reviewed all evidence before it, and, on the motion to reconsider, the trial court explicitly stated that it reviewed all factors, including defendant's rehabilitative potential. As noted, it is not our province to reweigh those factors. The trial court sentenced defendant to a 30-year term, which was about at the mid-point of the recommendations

and substantially less than the maximum allowable sentence. Furthermore, the trial court had the discretion to sentence defendant to consecutive terms and chose to sentence him to concurrent terms. We find that the trial court did not abuse its discretion in sentencing defendant.

¶ 88                                          III. CONCLUSION

¶ 89    For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 90    Affirmed.